# N. Y. SUPERIOR COURT.

## DAVID GROESBEECK, plaintiff, agt. WM. E. DUNSCOMB and MORGAN DIX, defendants.

A demurrer to a pleading admits all the material facts stated in that pleading, but alleges that those facts in law do not constitute a cause of action or defense, as the case may be.

A demurrer admits all the allegations, but it admits nothing but what is material and well pleaded, and it is only a technical admission, and does not involve a confession. Conclusions of law are never admitted by a demurrer.

Where a corporation is not made a party, its property cannot be taken from it and put into the hands of receivers.

Where the directors of a railroad company are sued individually, a receiver cannot be appointed to take charge of the affairs of the road; nor can one of two *cestui que trusts* be sued without the joining of the *cestui que trusts*.      -

The legal estate of every corporate body is vested, not in the individual corporators, but in the corporation itself; the estate, however, is a trust for the benefit of the corporators.                    .

By the wise policy of the law, corporate bodies are forbidden to be seized to a use; but, by a like policy, this law permits them to be vested with a trust.

Where a plaintiff desires to establish his claim to be a corporator, or to preach in the church of the corporation, or to have a receiver appointed to take charge of the corporate property, he cannot have such relief in an action against private individuals.

Where property is described, in a complaint, as being in the possession of defendants and their associates, styling them " The Rector, Churchwardens and Vestrymen of Trinity Church," and where it is not alleged that they are not entitled to these offices, their possession and acts are those of the corporation, and the corporation alone is the party to be held responsible for them.

Where predecessors are spoken of, it is equivalent to admitting that defendants have succeeded to the office of such predecessors.

Where defendants are, by the supposition of the complaint, possessed of property not in their own right, but in the right of the corporation, they ought not to surrender such property to a receiver without having the corporation before the court to defend its rights.                        ·

Statements in a pleading must be taken as strongly as possible against the party making them.

Where a party alleges that he is a corporator, or a successor to a corporator, it is very bad pleading if he do not also allege how he became a corporator, or a successor to a corporator.

Before a suitor can claim the interposition of a court of justice, either in law or in

Groesbeeck agt. Dunscomb.

equity, he must have some wrong to remedy, some grievance to redress, or some claim to enforce.

It is common for legislative bodies, in novel and special cases which have eluded the penetration of former legislators, to pass acts, in the nature of declaratory acts, to pluck up discord and litigation by the roots, that general quiet may be promoted. Such acts resemble bills of peace in chancery.

Members of every corporation have an interest in its estate while they continue members, and no longer.

A right to the corporate property is strictly local in its enjoyment. Whenever a corporator removes and settles permanently without the precints of the corporation, his franchise, *ipso facto*, ceases. Thus, if an inhabitant of the city of New York quits the city and takes up his residence in the county of Westchester, he relinquishes his rights as a member of the city corporation, and he cannot resume them in any other way than by returning and again fixing his residence in the city.

By the discipline of the English church no person can at the same time be a regular communicant in separate parishes under the care of different and independent rectors. The canons of the church particularly direct that the "sacrament shall not be administered by the rector of one parish to the parishioners of another, without the license of the rector of the latter parish, except to travelers, to persons in danger of death, or In cases of necessity."

The rector is authorized, under certain circumstances, to refuse the sacrament even to his parishioners.

The only legal evidence that the parishioner is a communicant is his receiving the sacrament in the parish church, by and with the consent of the priest, and the rector cannot take notice of the receipt of the communion in other parishes.

In expounding a statute, we are to presume that the legislator used words in their most usual signification—that he had the subject-matter constantly in mind—that all his expressions were directed to a reasonable end—that his train of thought was uniform—and that he intended to infuse into every part of the statute the same spirit.

Although legislatures should be inflexible in their resolutions to preserve the inviolability of private property, yet they can exercise their discretion in moulding the elective franchises of corporations into new shapes, the better to adapt such corporations to the progress of the times.

*Special Term, February,* 1871.

*First.* The amended complaint of the above-named plaintiff respectfully shows to this honorable court:

*Second.* That he is a citizen of the United States, and an inhabitant of the city of New York, and a successor of some of the original inhabitants thereof of Holland, who were corporators of a corporation chartered and granted by the following title:

"The rector and inhabitants of the city of New York in communion of the church of England as by law established, passed, 27th June, 1704. as an amendment of the original

charter of Trinity Church, in said city, granted by the title of the rector and inhabitants of our said city of New York, in communion of our protestant church of England as now established by our laws; passed on the 6th May, 1697."

*Third.* And plaintiff includes in this complaint so much of said original charter as this court may direct to be produced, but especially so much of the fourth section thereof as may show in what manner the funds were raised to build the original Trinity parish church and rector's parsonage house, and fence and inclose and grade the burial grounds adjoining said parish church by a "pound rate or otherwise," by taxes "charged upon all and every of the inhabitants of said parish of Trinity church in said city."

*Fourth.* And plaintiff includes in this complaint by its title, the "Act for making such alterations in the charter of the corporation of Trinity church as to render it more conformable to the constitution of the state, passed 17th April, 1784."

*Fifth.* And plaintiff cites especially and certainly as a part of this complaint "the constitution of the state of 1777," to wit, section 36: "and be it further ordained, that all grants of land within this state made by the king of Great Britain, or persons acting under his authority, after the 14th day of October, 1775, shall be null and void, but that nothing in this constitution shall be construed to affect any grants of land within this state made by the authority of the said king or his predecessors, or to annul any charter to bodies politic by him or them made prior to that date."

*Sixth.* And plaintiff says and includes, especially, in this complaint, that on the allegation, as set forth in said act of 17th April, 1784, that a council appointed by the legislature on 23d October, 1779, "upon the petition of sundry persons, styling themselves members of said church, and after hearing sundry other persons claiming to be church-wardens and vestrymen of said church, reciting that there

was, in the opinion of the council, reason to believe that the dissensions respecting said church might materially endanger the peace of said city, did in effect determine the said places of churchwardens and vestrymen to be vacant, and by their ordinance dated the 12th day of January, 1784, did vest the estate, real and personal, of the said corporation in nine persons therein named," to be retained and kept by them, or any five of them, until such time as further legal provision should be made in the premises.

*Seventh.* And plaintiff says, that said trustees named in said "ordinance" associated with themselves other trustees, under the act of April 17, 1784, and, either ignorantly or otherwise, neglected "entirely to carry into practical effect the spirit, meaning, or intent, or the provisions of said act, to render the charter of Trinity church more conformable to the constitution of the state."

*Eighth.* And plaintiff says, that said trust estate has been diverted more and more continually to this day from the purposes of inhabitants of the city of New York, who endowed said parish church, and were corporators thereof; and defendants are accessory after the facts, and personally continue and threaten to continue to divert said trust estate from the purposes of the founders of said corporation of Trinity church, and greatly injure plaintiff thereby, to wit, as herein specified.

*Ninth.* And plaintiff says that the purposes of the founders of the corporation of Trinity church was to prevent the increase of vice and immorality in the city of New York, and not merely to support the parasites of any sect.

*Tenth.* And plaintiff says that the jewish rabbi and his congregation contributed funds to build the original parish church of Trinity, in said city.

*Eleventh.* And plaintiff says he is of the same faith, baptism, and communion, to the best of his knowledge and belief, as the wardens and vestrymen of Trinity church corporation were on the 4th of February, 1714, to wit: John

Johnson, John Roosevelt, David Jamison, Oliver Teller, Johan Jansen, Cornelius Clopper, Jacobus Kip, John Cruger, Gerrit Kettletas, Jacobus Bayard, Stephen Buckenhoven, Abraham Wendell, Jacob Bennet, Isaac Decker, John Meyer, Henry Vanderspeigel, Anthony Rutgers.

*Twelfth.* And plaintiff says he is a protestant, a trinitarian, and a believer in the doctrines of the Christian communion, as established by the synod or ecumenical council of Dort.

*Thirteenth.* And plaintiff says that he has taken the sacrament in a chapel of Trinity church, in said parish, in good faith, and without any reference to the present action, before said defendants admitted the services of the Greek church communion in Trinity church, in said parish.

*Fourteenth.* And plaintiff says he is, and long has been, ready, willing, and anxious, being a protestant minister of the gospel, and without a church edifice, to preach in said parish church, the same as the ministers of the church of England, as by law established used to preach alternately with the Reformed Dutch church minister in their church in Nassau street in said parish, before the first rector of Trinity church had any church erected, and said defendants have refused parishoners of said parish this privilege when requested to allow it.

*Fifteenth.* And plaintiff says he is ready, willing, and anxious, to do and perform every act and thing necessary and proper for him to do to secure all his rights, liberties, franchises, and endowments, as a corporator and successor of the ancient inhabitants of the city of New York, who founded and endowed said parish church corporation.

*Sixteenth.* And plaintiff says that the trust estate in possession of said defendants and their associates, styling themselves "the rector, churchwardens, and vestrymen of Trinity church in the city of New York," consists of lands in said city, anciently described as the " King's Farm and Garden," and a grant made by Wouter Van Twiller to Anneke Jauts and Roeloff Jansen, her first husband, for

eminent services, said grant consisting of sixty-two acres, Dutch measure, situate next north of said farm and garden, and south of Christopher street, and between Hudson River and Broadway, on the west and east in said city; also the parish church site and edifice, as described in said original charters of 1697, and 1704; also of a cemetery on the island of Manhattan in the way of the city's growth, to wit, between 153d street on the south, and 155th street on the north, and Tenth Avenue on the east, and Hudson River on the western boundary thereof, purchased by proceeds of the sales of said farm, garden, and grant; also of bonds and mortgages derived from said real estate, as more particularly described in a public document on file in the state library in Albany, entitled "Reports of the Select Committee of the Senate on affairs of Trinity Church, with the testimony relative thereto. Albany, Van Benthuysen, printer, 1857," which document, in so far as it describes said property, is ready to be produced as a part of this complaint, as this honorable court may direct.

*Seventeenth.* And plaintiff says that said defendants and their associates conspiring with them, and who when better known will be included as parties defendant in this action as this court may direct, are wasting and have wasted, and as plaintiff believes are intending to waste the trust estate in their hands, to the great loss, damage, and injury of plaintiff and his associates, who may also be joined as parties plaintiff with him, on motion as this court may direct. Such waste plaintiff believing being in contravention of the intention of the contributors to the trust estate in the hands of said defendants and their associates—that is to say; in seeking to acquire and establish a "political weight," and boasting thereof; in having threatened the legislature of the state with contempt when called to account for their stewardship of said trust estate; in having neglected to provide for the poor of the parish, while pampering the pride of the worldly-minded, and laying up treasures on earth in

bonds and mortgages, held over Episcopal churcnes ; in said Morgan Dix, defendant herein, preaching that " protestantism is a failure ;" also, " that Luther perceived he had committed a gigantic error in advocating the scriptures alone as a means of salvation, knowing well that the authority of the church was the instrument that should decide controversies of faith ;" and also, " that protestantism, as a moral system, is stamped as a failure," to wit, in the parish of Trinity church, in the city of New York, in the year 1869.

*Eighteenth.* And plaintiff says, that the said William E. Dunscomb and his associates, pay out of the revenues and endowments of said parish church, a stipend or salary for preaching such blasphemies, and is accessory thereto.

*Nineteenth.* And plaintiff says, that the said Morgan Dix, defendant herein, preaches in said parish, " that while denying the dogma of the immaculate conception, any form of catholicism is better than the private judgments of the protestants who effected the reformation."

*Twentieth.* And plaintiff says, that the said defendants, denying as aforesaid the communion of both Roman catholics and protestants, have admitted into said Trinity parish church the services of the Greek communion.

*Twenty-first.* And plaintiff says, he is informed and believes that said defendants are receiving, and wasting as aforesaid, an income of about eight hundred thousand dollars by the year more than is allowed under the act of April 17, 1784, or any act of any succeeding legislature of the state of New York.

*Twenty-Second.* And plaintiff says, that the said Morgan Dix, defendant herein, advocates the establishment of houses of ablebodied young women in said parish by means of the said surplus revenues, and the said William E. Dunscomb, defendant herein, connives thereat, and is accessory thereto.

*Twenty-third.* And plaintiff says, that the said defendants

have allowed vice and immorality to increase in said city, and have established no effectual means to prevent Church street and houses of ill fame in the lower part of Greenwitch street from being more and more scandalous, the more and more said defendants and their predecessors have departed from the protestant faith and baptism of the founders of the trust estate in their administration.

*Twenty-fourth.* And plaintiff says, that by the conduct of the defendants and their associates, as hereinbefore specified, he is in danger of the final loss of all his liberties, rights, franchises, endowments, or properties, which belong to him as such corporator of the corporation of Trinity church, as chartered June 27, 1704, plaintiff being advised by counsel and verily believing that by such acts of defendants and their predecessors the property and endowments of said corporation fall to the poor of the parish of said Trinity church and city, according to the practices of the realm of England.

*Twenty-fiifth.* And plaintiff says, that said defendants constantly assert that they will never admit that they have any obligation resting on them under the fifth section of April 17, 1784, to restore to the heirs of Anneke Jants the grant of sixty-two acres, Dutch measure, made by the Dutch governor, Wouter Van Twiller, and their possession, and never will restore the same.

*Twenty-sixth.* Wherefore plaintiff demands judgment, and prays that an order may be made herein by this honorable court appointing a receiver, with the usual right, power, and authority of receivers in such cases made and provided, to whom the said trustees, defendants herein, and their associates, calling themselves " the rector, churchwardens, and vestrymen of Trinity church, in the city of New York," may be compelled to account for all the proceedings in the premises, subject to such other and further orders as this honorable court may direct.

DAVID GROESBEECK,

*City and County of New York, ss. :*

David Groesbeeck, the above named plaintiff, being duly sworn, says, that he has read the above amended complaint and knows the contents thereof, and that the same is true of his own knowledge, except as to the matters therein contained and stated on information and belief, and as to those matters he believes it to be true.

DAVID GROESBEECK,

Sworn to before me, this 18th day of March, 1869. VINCENT CLARK, *Notary Public in and for the city and county of New York.*

### (Title of Cause.)

Demurrer.

The above named defendants demur to the amended complaint of the plaintiff in this action, and specify the following grounds of objection thereto :

*First.* That it appears upon the face of said complaint that there is a defect of parties defendant, in the omission of the corporation therein stated to have been incorporated by the name of *the rector and inhabitants of the city of New York in communion of the church of England as by law established.*

*Second.* That the said complaint does not state facts sufficient to constitute a cause of action.

G. M. OGDEN,
*Defendant's Attorney.*

Points for defendants on demurrer.

I. As to the first ground of demurrer.

Defect of parties defendant in the omission of the corporation " the rector and inhabitants of the city of New York, in communion of the church of England as by law established."

This is the corporate name of the corporation according to the complaint, and to two acts of the legislature in the complaint referred to. Subsequent acts changing the name

are not referred to in the complaint, so that the defect appearing upon the face of the complaint is that herein mentioned.

Plaintiff bases his right to bring this action upon the fact of his being a corporator, or at least a successor of some persons who were corporators to this corporation, of his religious tenets agreeing with those of certain persons who were once wardens and vestrymen of said corporation, of his willingness to preach in the parish church of said corporation and to do whatever may be necessary and proper to secure his rights as a corporator. Also, upon his having taken the sacrament in a chapel of said church.

The matters of which plaintiff complains are the diverting the property of the corporation from the purposes of the original founders thereof, and the refusal to allow plaintiff to preach in Trinity church.

The relief demanded is the appointment of a receiver, and though the prayer does not state of what property a receiver is desired, it is not possible to suppose that the property of the corporation is not meant, there being none other mentioned in the complaint.

These considerations make it evident that the corporation is a necessary party to the proper determination of the controversy. If the plaintiff desires to establish his claim to be a corporator, or to preach in the parish church, or to have a receiver appointed to take charge of the corporate property, he clearly cannot have any such relief in an action against two persons who, as far as appears by the complaint, are not members of the corporation at all.

Again, the property is described as being in the possession of the defendants and their associates, styling themselves the rector, church-wardens, and vestrymen of Trinity church. It is not alleged that they are not entitled to these offices, and if they are so entitled, their possession and acts are those of the corporation, and the corporation is the party to be held responsible for them. By implication their title to the

offices is admitted, their predecessors being spoken of, which is equivalent to admitting that defendants have succeeded to the offices.

Defendants being, by the supposition of the complaint, possessed of certain property not in their own right but in the right of the corporation, ought not to surrender it to a receiver without having the corporation before the court to defend its rights in the case.

II. As to the second ground of demurrer.

Failure to state facts constituting a cause of action.

None of the acts or omissions charged in the complaint are the subject of an action.

It is not alleged that it was the duty, or in the power, of defendants to provide for the poor of the city, or to prevent Church street from being scandalous, or to do any of the other things which they are charged with having left undone.

On the other hand, the sermons of the defendant Dix, and his schemes for the establishment of houses of mercy, and such institutions, are not matters which can be inquired into by a civil court.

So, also, seeking to acquire " political weight," and " threatening the legislature with contempt," are not wasting the church property.

Neither is there any thing in the complaint to show that plaintiff had a right to preach in Trinity church, or that defendants had any power either to permit, or prevent it.

In conclusion, the whole case of the plaintiff fails by his omission to show that he has any interest in the subject-matter of the action. The qualifications of corporators are plainly stated in the act of April 17, 1784, and plaintiff does not allege that he possesses them.

III. As to the question of granting leave to amend—

This is a matter wholly in the discretion of the court, and if the court is satisfied that the plaintiff's notions as to his rights and remedies are wild and absurd, it will act the part

of kindness in dismissing the complaint altogether. Plaintiff has already been compelled, by order, to make his complaint definite and certain, and it now appears definitely and certainly that he has no ground for bringing the defendants into court at all.

As to the effect of a demurrer in admitting the allegations of the pleading demurred to—a demurrer is only a technical admission, and does not involve a confession which is, in any way, damaging to the character of the parties.

Even technically, a demurrer admits nothing but what is material and well pleaded.

Such allegations as mostly compose the complaint in this action, are not admitted by the demurrer, because they are immaterial, Some, such as that in the eleventh paragraph, because badly pleaded.

Conclusions of law are not admitted by the demurrer, such as the charges of diversion and of waste. Only facts are admitted.

Above all, statements not in the complaint at all are not admitted, though they may be made by the plaintiff's counsel; those, among others, about establishing disreputable houses; twenty-six persons claiming to be the corporation; refusing Bishop Wainwright a list of corporators, &c.

As to the charge that defendants have departed from the protestant faith and baptism—

This is intended to sustain the charge of diversion of the trust estate from the purposes of the founders. If the purpose of the founders were to suppress vice and immorality, it is plain that to adhere to the protestant faith and baptism was not necessary for that purpose. But if the purpose was rather, as the charter shows, to establish a parish church in communion with the church of England, then it should be alleged that the protestant faith and baptism were those of the church of England. This is not alleged, and is not admitted by the demurrer.

Neither is this a universally admitted fact of history, or

legal truth.   Without entering into theological discussion, it is pertinent to remark—

That the church of England holds the catholic faith to be necessary.

That it does not use the word protestant.

That it acknowledges one baptism for the remission of sin.

⸱. Also the authority of the church in matters of faith (21st *article*).

Luther is esteemed as a saint among protestants, but is not in the calendar of the English church, as are St. Peter, St. Clement, bishop of Rome; St. Boniface, bishop of Rome; St. Sylvester, bishop of Rome; and St. Gregory the great.

As to the synod (ignorantly called by the plaintiff the ecumenical council) of Dort, counsel for plaintiff wholly misrepresented it.   It is perfectly notorious that it never pretended to settle the doctrines of the Christian communion, but only some miserable controversies between Calvinists and Armenians.   Certain representatives from England were present at the synod, but without power to commit the church of England to any thing.   The decrees of the synod were never accepted in England, and were vigorously opposed both by the king and the archbishop of Canterbury.

Other charges of the complaint.

The other charges in the complaint, from the seventeenth paragraph to the end, which together are supposed to make up the great offense of diverting the trust funds from the purposes of the founders may summarily be disposed of. Supposing them true, they do not in any way affect the estate, if we except the statement in paragraph eighteen, that a "salary" is paid for preaching blasphemies.   Statements in pleading must be taken as strongly as possible against the party making them.   This statement does not necessarily imply any more than that the salary which is due on account of services generally is not withheld on account of

the alleged blasphemies. There is nothing wrong about this. Even if what was preached on two or three occasions had been plainly heretical, the treasurer of the corporation would not have been called upon to stop paying the salary.

The charge of the twenty-second and twenty-third paragraphs must also be construed strictly, and so construed there is nothing in them.

As to the income of the corporation, if that be excessive, it is not for the plaintiff to complain. His learned counsel might have taken some action on the subject when he was attorney-general, but it is too late for him to do so now.

As to the non-joinder.

Plaintiff says he does not sue the church, or seek to take its property away from it, but he does seek to take it away from the present trustees, who are elected by and represent the whole body of corporators, and to put into the hands of others not so elected. This is a thing about which the corporation has a right to be heard.

How preposterous it would be to sue two of the directors of a railroad company, and seek in that suit to have a receiver appointed to take charge of all the affairs of the road, or for one of the two *cestui que trusts* to sue for the removal of the trustee without joining the other *cestui que trusts*.

To conclude, the complaint does *not* show—

That the plaintiff is a corporator, or

That the affairs of the corporation have been mal-administered.

It *does* show.—

The existence of a corporation, which is vitally interested in the questions raised in this action, and is therefore a necessary party to their determination.

G. D. L. HARISON, <em>of counsel.</em>

Points for plaintiff in opposing the demurrer.

The defendants have demurred to the complaint on two grounds :

*First.* For non-joinder of parties.

*Second.* That the complaint does not state facts sufficient to constitute a cause of action.

The first ground is clearly untenable, because—

*First.* The complaint gives the names of the only parties known, but asks that when the other parties are discovered they may be made parties defendant to this suit. This is all that the plaintiff could or can do.

The rule of pleading *before the adoption of the Code* re quired that the *party demurring* should give the names of the parties alleged to have been omitted, to enable the plaintiff to have all the parties before the court by an *amended declaration.* The Code, by abolishing the *form* of pleading, has not abolished this principle.

*Second.* A demurrer does lie for a non-joinder of parties. *(Peabody* agt. *The Washington Mutual Ins. Co.,* 20 *Barb.,* 339).

*Third.* Section 144 of the Code authorizes the defendants to demur to certain specified cases, but he must be confined to the cases thus specified. *(Sanborn* agt. *Loft,* 8 *How.,* 234).

*Fourth.* It is not good cause of demurrer that there are too many plaintiffs or too many defendants.

*Fifth.* A demurrer to a complaint for a defect of parties cannot be sustained for want of parties if the court can determine the controversy before it without prejudice to the rights of others, or by saving their rights. *(Supreme Court,* 1850, *Wallace* agt. *Eaton,* 5 *How.,* 99).

*Sixth.* An improper joinder of parties plaintiff is not a subject of demurrer. *(Code sec.,* 144 ; *Lewis P. Allaire et al.,* agt. *The City of Buffalo, decided in Court of Appeals, June Term,* 1868).

Defendant's second ground of demurrer is, that the com plaint does not exhibit sufficient cause of action. The

Groesbeeck agt. Dunscomb.

answer to this might be simply a demand on defendants to answer what single wrong it is probable for trustees to commit, and plaintiff will undertake to show that defendants represent those who have been guilty of such wrongs, and are accessories, and that it is charged or implied in the declaration. They were charged in the complaint, of which the present is an amendment, that as trustees under the act of 1784, they were required to render the charter of Trinity church as it existed, subject to the control of the bishop of London, more conformable to the constitution of the state of 1777, section 36 of which preserves all old charters according to the doctrine of *ses pres.*, that is to say, as near to the ancient charter as is possible, without violation of our constitution. And plaintiff charged in general terms that the defendants, as such trustees, had done those things they ought not to have done, *had been guilty of misusers*, and had left undone those things they ought to have done, had been guilty of non-users, and there was no cure in them. Defendants do not deny a word, but demand specifications of particular charges, and especially that the plaintiff shall show how he is a corporator of the corporation, on whose behalf, or for himself he prosecutes, and that he should show wherein he is injured. This he has done in the present amended complaint, and it is not denied but admitted, nor do they dare to deny it under oath.

And defendants admit that they are trustees, and required to carry out the act of 1784, to render the corporation more conformable to the constitution of 1777.

Plaintiff charges that all of the inhabitants of the city contributed to build Trinity church, and the parsonage, and to pay the rectors, and the constitution requires that those who have advanced money for any purpose shall have that purpose effected or that the money shall be returned, since private property cannot be taken for public use, and much less for a close corporation (such as has been in fact created,) without due *process of law*, or *just compensation*.

*Here is the gist of the action.* We charge that the money was given by all tax-payers to prevent the increase of vice and immorality in the city of New York, "and not to support the parasites of any sect, and, least of all, for political purposes under the garb of religion. But instead of heeding this, as we charge, they boast of their political weight," when called to account, and attempt to crush the *right of private judgment* on religious matters.

That they break the law of mortmain, and refuse to stand accountable under the fifth section of the act of April 17, 1784, for the property taken by force and fraud from the Bogardus heirs; and that they allow houses of ill fame to exist in Church street, and contemplate the establishment of houses of able bodied young women in contradistinction to assisting the poor and weak, for we do not put a scandalous interpretation on this; but inasmuch as a corporation has no discretionary powers, it makes void a charter to even do more good than is expressly allowed by a charter, least it should become too powerful. On this point, says Mr. Webster, the following rule of law is settled. "The specification of certain rights operates as a restraint to such objects only, and is an implied prohibition of other powers. (18 *Johns.*, 382; 2 *Cow.*, 709; 9 *Wend.*, 384; *Runyan*, agt. *Carter*, 14 *Peters*, 122; 8 *Com. Rep.*, 247; 5 *Com. Rep.*, 391; *Beatty*, 29, 8, 7; 2 *Dallas*, 316).

The last reference is in support of the rule stated as follows: "A statute should never have an equitable construction in order to overthrow or divert an estate, and every statute derogatory to the rights of property, or that tends to take away the estate of a citizen, ought to be strictly construed." But we charge also that they hold a much larger estate than the law or constitution of either England or the state of New York allows, and that it gives great "pre-eminence" in power to purposes at war with the purposes of the founders of the charity.

Plaintiff's counsel (Roosevelt) referred to the case of

*Miller et al.* agt. *Gable, et al.,* as to the property of the German Reformed church in Forsyth street, in which the worshipers became dissentient among themselves as being in point.

In that case the doctrine of the English and American courts was stated as follows, by the assistant vice-chancellor, and sustained at length in the court for the correction of errors:

" I discard the factious doctrine that the majority for the time being is to govern.  I hold I am bound to interfere upon the complaint of a single worshiper in the church against a thousand others.

" *Provided, first.* That the property was dedicated to a certain legal purpose, &c.

" *Second.* That it is certain the possessors of the property are violating these purposes."

This, as I apprehend, settles the point as to the non-joinder of parties.

In the case of the *Attorney-General* agt. *Pearson* (3 *Merivale,* 409), which Mr. Justice NELSON accepts as the rule also in our courts, by reference thereto in the case of *Field* agt. *Field* (9 *Wend.,* 401), Lord ELDON holds it is settled (*p.* 400), " that where a congregation becomes dissentient among themselves, the nature of the original institution must alone be looked to as the guide for the decision of the court.

" And to refer to any other criterion (as to the sense of the existing majority) would be to make a *new institution,* and is altogether beyond the reach, and inconsistent with the duties, of the court."

In support of this rule the cases of *Craigdale* agt. *Aikman,* (1 *Dow. P. C.,* 1), of *Foley* agt. *Wouter* (2 *Jacob & Walk.,* 245), of *Leslie* agt. *Burrey,* (2 *Russel,* 114), of *Davis* agt. *Jenkins* (3 *Ves. & Bea.,* 114), of *Milligan* agt. *Whitehall,* ( *Milne & Craig,* 72, *and Milne & Keen,* 446) ; the *Dart-*

*mouth College case* also (4 *Wheat.*, 578), follows the same principles.

The *Lady Hewley case*, or, as it is known in the books as, *Attorney-General* agt. *Share* (7 *Simons*, 309), is the leading authority in England.   It is stated by Lord SUGDEN in the *Attorney-General* agt. *Drummond* (1 *Connor & Lawson* 210).   It was first decided by SIR LANCELOT HADWELL, vice-chancellor; affirmed by Lord LYNDHURST, chancellor, assisted by Baron ALDERSEN and Mr. Justice PATERSON; and, in 1842, affirmed in the House of Lords, so that it comes armed with the whole judicial force of England.

In the amended complaint the original purpose of the charity is referred to, and the means of accomplishing its purpose as laid down in the charter also referred to as the parish system of London, in which all who pay scot and lot may vote for wardens and vestrymen, and govern the rector when indolent or intolerant; which is the very best system of church government ever invented by man, and which, it is very manifest, has not been established in the city of New York, while a close corporation has been, and which has set not only the law of mortmain, embraced in the *Magna Charta*, but also our own laws and constitution, at defiance, and deprived plaintiff of every right, under the ancient charter, which he might have enjoyed were this yet a British province.

As to the charter of 1814, we hold it as obtained by a breach of trust and void, and decline to recognize it at all in the declaration.        Respectfully,

CLINTON ROOSEVELT,<br>
*Of counsel for plaintiff.*

McCUNN, J.—The above is the amended complaint in this case.   The plaintiff asks for a receiver.

The defendants interpose a demurrer:

*First.* They say: "That it appears upon the face of the complaint that there is a defect of parties defendant, in this

the omission of the corporation therein named, to wit: the rector and inhabitants of the city of New York in communion of the church of England as by law established."

"*Second.* That the said complaint does not state facts sufficient to constitute a cause of action."

A demurrer to a pleading admits all the material facts stated therein, but alleges that those facts, in law, do not constitute a cause of action, and submits that question, and that question alone, to the judgment of the court. A demurrer admits all the allegations, but it admits nothing but what is material and well pleaded; consequently, such allegations as compose this complaint, they being all immaterial, are not admitted. Moreover, a demurrer is only a technical admission, and does not involve a confession; consequently, the demurrer herein is not, in any way, damaging to the character of the defendants. Again, conclu sions of law are never admitted by a demurrer; consequently, the charges of waste and diversion, and that the defandants have departed from the protestant faith, contained in the pleadings before me, being conclusions of law, are not admitted.

In regard to the non-joinder of parties. It is sought by this action to take away the property of the church and corporation. It will be seen by the complaint that the only defendants named in the suit are Mr. Morgan Dix, one of the clergy of the Trinity church corporation, and Wm. E. Dunscomb, Esq., one of the counsel to said corporation. The corporation is not made a party, and yet the plaintiff seeks to take from it its property, and put the same into the hands of receivers.

Emphatically this cannot be done without the corporation being first heard, after having been made a party. How preposterous it would be to sue two of the directors of a railroad company individually, and seek, in that action, to have a receiver appointed to take charge of all the affairs of the road; or for one of two *cestui que trusts* to sue for

the removal of the trustee without joining the *cestui que trusts*.

The legal estate of every corporation is vested, not in the individual corporators, but in the corporation itself; the estate, however, is a trust for the benefit of the corporators. By the wise policy of the law, corporate bodies are forbidden to be seized to a use, but, by a like policy, the law permits them to be vested with a trust. Hence, if these two defendants actually have an interest in the estate of the corporation of Trinity church, it can only be as *cestui que trusts*. (2 *Bac.*, 11; *Sanders on Uses*, 227; 1 *Vesey*, 467, 536.)

The complaint shows—and it is about the only fact it does show—the existence of a corporation, and that such corporation is vitally interested in the question sought to be raised in this controversy. It is, therefore, a necessary party to its final determination. These considerations make it evident that the corporation must be a party to the proper determination of the controversy. If the plaintiff desires to establish his claim to be a corporator, or to preach in the parish church, or to have a receiver appointed to take charge of the corporate property, he clearly cannot have such relief in an action against two private individuals who, as far as appears by the complaint, are not members of the corporation at all. Again, the property is described in the complaint as being in the possession of the defendants and their associates, styling them "the rector, churchwardens, and vestrymen of Trinity church." It is not alleged that they are not entitled to these offices; and if they are so entitled, their possession and acts are those of the corporation, and the corporation alone is the party to be held responsible for them. By implication in this pleading their title to the offices is admitted, their predecessors being spoken of, which is equivalent to admitting that defendants have succeeded to the offices. Defendants being, by the supposition of the complaint, possessed of certain property not in their own right, but in

Groesbeeck agt. Dunscomb.

the right of the corporation, ought not to surrender such property to a receiver without having the corporation before the court to defend its rights. The defect of parties is the omission of the corporation. "The rector and inhabitants of the city of New York in communion of the church of England, as by law established." This is the corporate name of the corporation according to the language of the complaint, so that this defect appearing upon its face, the first ground of demurrer is well taken.

As to the second ground, that the complaint does not state facts sufficient to constitute a cause of action. The allegation that the defendants have departed from the protestant faith and baptism was, I suppose, intended to sustain the charge of the diversion of the trust estate from the design of the original corporators. Now, if the object of the founders of Trinity church was to suppress vice and immorality, it is very plain to all that to adhere to the protestant faith and protestant form of baptism is not at all necessary for that purpose.

The charges in the complaint from the seventeenth paragraph to the end make up the offense of diverting the trust funds from the purposes of the founders. Now supposing them true, they do not in any way affect the estate, if we except the statement in paragraph eighteen, that a "salary" is paid for preaching blasphemies. Statements in a pleading must be taken as strongly as possible against the party making them. This statement does not necessarily imply any more than that the salary, which is due on account of services generally, is not withheld on account of the alleged blasphemies. Even if what was preached on some occasions had been plainly heretical, the treasurer of the corporation would not have been justified in stopping salaries. The remedy to prevent preaching heretical doctrines is of another kind, and to be applied for in a different way. There is nothing int he charges of the twenty-second and twenty-third counts. They must be construed strictly and

when so construed they amount to nothing. In regard to the allegation that the income of this corporation is very largely in the excess of its charter ($800,000 per year). The answer to that is simple : *this court cannot provide a remedy.* Application in such case must be made to the attorney-general. Again, the plaintiff bases his right to bring this action upon the allegation of his being a successor of some persons who were, some hundred and seventy years since, corporators of this corporation ;—of his religious tenets agreeing with those of certain persons who were living some hundred and fifty years since, and who were supposed to be wardens and vestrymen of said corporation; —of his willingness to preach in the parish church of said corporation, and to do whatsoever may be necessary and proper to secure his rights as a corporator;—also upon his having taken the sacrament in a chapel of said church. Now all this is very bad pleading, because it does not show, or attempt to show, how he became a corporator or a successor of a corporator. As to his willingness to preach in "Trinity parish church," I have no doubt whatever in regard to such willingess. Nay, more, if such willingness were good cause of complaint, or if such condescension on the part of plaintiff could be made the basis for a good count upon which to sustain an action, that there are many of the clergy in the different protestant denominations who would most willingly condescend in like manner to preach in Trinity church. Indeed, I am afraid if such were the case, and this court had jurisdiction over the subject-matter, there would be no end of actions against the corporation. Apart from all this, however, he does not state a single fact showing, that he, plaintiff, had a right to preach in Trinity church, or that defendants had any power either to permit or prevent him from so preaching.

It is not alleged that it was the duty or in the power of the defendants to provide for the poor of the city, or to prevent Church street from being scandalous, or to do any of the

other things which they are charged with having left undone. As to the scheme of the defendant, Dr. Dix, for the establishment of houses of mercy and the like, these are not matters which can be inquired into by this court, nor can the seeking to acquire " political weight," and threatening the legislature with contempt, be considered a wasting the church property.

Numerous cases are cited by counsel for plaintiff, not one of which bears in the slightest degree on the questions raised by the demurrer. Indeed, if all the sound law was gleaned from such citations, it would be insufficient to give even a patchwork construction upon which to build the wild and constrained theories indulged in this complaint.

Perhaps, from viewing doubtful cases in this light, a habit of false construction of all cases, sounding in name like the one under consideration by them at the time is, unawares, formed by some counsel, and predilections in their minds sort the tangled heap of decisions into a desired shape to suit their purpose long before plodding patience after truth and good law has addressed itself to the task. From this temptation, it is feared, the counsel for the plaintiff has not wholly escaped, because how else could he have cited long quotations from such cases as " *The Lady Hewley case*, (7 *Simons*, 309 ;) *Field* agt. *Field*, (9 *Wend.*,) *Attorney-General* agt. *Drummond*, (1 *Conor & Lawson*,)" and many others, not a line of which applies to the case in hand—cases containing the history of the controversies between different parts of individual protestant sects, and not having the slightest bearing on the point before us.

There is another and a very grave objection, and, I hold, a valid reason in law why this plaintiff should not be listened to.

Before a suitor can claim the interposition of a court of justice, either in law or in equity, he must have some wrong to remedy, some grievance to redress, or some claim to enforce. It is for accomplishing these righteous objects

courts of law and courts of equity are organized.   They are
not, however, to be used as the resorts of the disappointed,
the malignant, or the foolish.   They should be, and I trust
are, the tribunals wherein disputes between man and man
are fairly, justly, and humanely disposed of; and as the very
basis upon which to grant that justice, the first question,
absolutely the very first, that is presented to the mind of any
court in any litigation is, whether the party invoking the
majesty of the law is entitled to relief, and whether he has
justly and fairly placed himself in a position to claim the
judgment of the court whose justice he solicits, because if
he has not, then there ends the inquiry.   Now, applying
these general legal principles to the subject matter before
us, the question first presented to us is.   Is this plaintiff
entitled to the remedy he seeks, and has he placed himself
in a light so as to enable him to demand of our hands such
a remedy?   Absolutely we say he has not.   Let us look
at his position.   On the 6th day of May, 1697, William
III., through  governor  Fletcher, then  captain-general of
the province of New York and territories, granted to Trinity
church (the foundation and spire of old Trinity church being
then  built) a  charter  under the  corporate name of "the
rector and inhabitants in communion of the church of Eng-
land as now established by our laws" (*See charter line*, 100).
The charter, among other things, provides that the parish
shall be named " the parish of Trinity church" (*Charter, line*
145).   The charter also describes what lands shall go with
the enclosure of the church for grave-yard purposes and the
like.   After defining what the duties of said corporation
shall be, it declares (*line* 565) that "the said rector and in-
habitants in communion," &c., shall nominate and appoint
such people of said parish as they shall think fit, and *shall
be willing to accept the same, to be members of said church*, and
be entitled to vote at the annual elections for churchward-
ens and vestrymen of said corporation.   Thus the charter
stood so far as the admission of members to said church was

concerned, and also so far as electing officers, &c., until 1814 (some slight alterations excepted), when, among other things, it was enacted that " all male persons of full age, who for the space of one year preceding any election shall have been members of the congregation of Trinity church aforesaid, or any of the chapels belonging to the same and forming part of the same religious corporation, and who shall hold, occupy, or enjoy a pew or seat in Trinity church, or in any of the said chapels, or have partaken of the holy communion therein within the said year, and no other persons, shall be entitled to vote at the annual election for the churchwardens and vestrymen of the corporation."

Now, this section was intended as explanatory, and as a direction for those who were entitled to vote for officers of said church; and plaintiff claims that because a part of this section declares that any person who has partaken of the holy communion within one year shall be entitled to vote, and that as he entered said church as a stranger, and not a member of said communion, and formally partook of the communion in Trinity chapel, without any previous probation or preparation, and without the priest who administered the sacrament consenting or even knowing who he was, that consequently he is entitled to vote at the election of such officers. This would be an *odd* doctrine indeed. That a stranger, a member of an entirely different religious persuation, can vote, is simply preposterous. With the same propriety can a resident of Philadelphia, a strange, a bad man, indeed an alien to this tcountry, come to this city, register his name, and vote at our elections. The proposition is too absurb for serious entertainment. What is meant by this section of the amended charter above cited is simply this: That any just and good man who had properly prepared himself for the holy communion, and who had been duly and properly accepted by the rector into the church as a true and good communicant, could vote at the election for the officers of said church, and have all the rights and bene-

fits accruing from the corporation ; this is what was intended by that section, and what was meant by it, and nothing else.   It did not mean, and cannot by any tortured form of construction, mean, that any adventurer, for the purpose of causing litigation and for the express purpose of acquiring wealth, could enter said church and wickedly go through the form of a communion and be called a member, and that for the purpose, as it would seem from the complaint, of harassing its organization.   Could folly or wickedness contrive a scheme of spiritual intolerance more wounding to the sensibilities of any religious people, and more to be repudiated by the generous principles of our free institutions !   But again, this plaintiff does not say he is an episcopalian, or a member of the church of England, or of Trinity church, but says he is " a protestant, a Trinitarian, and a believer in the doctrines of the Christian communion as established at the synod at Dort," and that he belongs " to the Dutch Reformed church."   It is clear, therefore, if he is a Dortite and belongs to the Dutch church, he is not an episcopalian, or a member of the English church, or a communicant.   He says, however, as I have above related, that he took the sacrament in Trinity chapel, and that that act of itself, without being a member of the episcopal community, entitles him to vote.   Now, let us see about this.   Let us examine the cause which led to the adoption of this law.

The churchwardens and vestrymen of Trinity church, following the example of their English ancestors—their original house being too small—founded two or three other places of worship, and called them chapels of Trinity church. The natural effect of this system was, that this church and its chapels formed one church, their several congregations were knit into one body, and the communicants in each congregation went, on Easter Tuesday, to the poll of Trinity church, and voted for the same churchwardents and vestry-

men; and these, by their office, took all the churches under their common government.

As the charter incorporates those who are in communion with the church of England, communicants alone, before the Revolution, were admitted to the privilege of voting for charter officers; and the records of the church furnish no instance of a contrary practice.

At length the episcopalians, by the increased population of the city, were too numerous to be accommodated in Trinity church and its chapels. In this situation, a respectable portion of the episcopalians had recourse to the act entitled " an act to provide for the incorporation of religious societies" (1 *Jones & Varick's Laws*, 104, 109, *passed* 1784) for relief; and in the year 1793 they began to incorporate themselves under that act into separate churches and societies.

The members of the new corporations, thus organized under the religious societies' act, elect their own churchwardens and vestrymen. They neither hold pews nor seats in Trinity church, nor do they commune in that church or contribute to its support. The vestries of the new corporations appoint their own rectors, clerks, and sextons, and they manage all the spiritual and temporal concerns of their own churches as they please, paying no regard whatever to the vestry of Trinity church.

As a consequence of the new corporations, the congregation of Trinity church consists of those only who attend worship in that church and its chapels, St. Paul's church and St. John's church, and Trinity chapel, the latter having been recently built, as a chapel, by Trinity church.

No members of either of the new corporations ever claimed, or pretended to claim, a right to vote for the churchwardens and vestrymen of Trinity church prior to the election held for those officers in March, 1812. At that election several persons, known to be members of the new corporations, offered themselves as voters, but they were

rejected, because neither of them was a pew or a seat-holder, or communicant in Trinity church or either of its chapels. After this attempt to vote by outside episcopal communicants, a memorial was presented to the legislature, asking, among other things, for an interpretation of the charter relative to the right of voting.

A bill was accordingly introduced, and in its passage through the houses met with little opposition, except from its presumed interference with the elective franchise; and in the house of assembly it was referred to the attorney-general to report "whether, in his opinion, its passage would, in anywise, defeat or vary any existing rights under the charter, or any acts altering it." The attorney-general reported that he "had examined the charter and the acts altering it, with the bill referred to him, and he was of opinion that its passage would not defeat or vary any existing rights under the acts or charter."

As the claim to vote had a tendency to create uneasiness in the minds of the members of the church, and to excite dissensions among episcopalians in general, one of the objects of the bill was to obtain such an interpretation of the charter as would effectually extinguish the claim. Now, it is common for legislative bodies, in novel and special cases which have eluded the penetration of former legislators, to pass acts, in the nature of declaratory acts, to pluck up discord and litigation by the roots, that general quiet may be promoted. Such acts resemble bills of peace in chancery.

By thus showing that the members of the new corporation are not also members of the corporation of Trinity church, we have put at rest all questions respecting their supposed right to the corporate property.

Members of every corporation have an interest in its estate while they continue members, and no longer. A right to the corporate property is strictly local in its enjoyment. Whenever a corporator removes and settles permanently without the precincts of the corporation, his franchise, *ipso*

Groesbeeck agt. Dunscomb.

*facto,* ceases. Thus if an inhabitant of the city of New York quits the city and takes up his residence in the county of Westchester, he relinquishes his rights as a member of the city corporation, and he cannot resume them in any other way than by returning and again fixing his residence in the city.

These principles being indisputable, prove the utter futility of the claim which the plaintiff makes as to his being a corporator, or as to his interest in the estate of the corporation of Trinity church as such corporator.

Whoever reads the act for incorporating religious societies, and reflects upon its provisions, and also upon the freedom of our civil and religious institutions, must be persuaded that the legislature intended that every society incorporated under the act should enjoy a separate and independent existence, and be wholly governed in its spiritual and temporal concerns by officers of its own choice. The act provides that " the persons qualified to vote at elections for church officers shall be male persons of full age, who shall have belonged to the church or congregation for the last twelve months preceding the election, and who shall have been baptized in the church, or shall have been received therein either by the right of confirmation, or by receiving the holy communion, or by purchasing or hiring a pew or seat in the said church, or by some other joint act of the parties and of the rector; that the voters on a certain day in every year shall, by a majority of voices, elect two churchwardens and eight vestrymen; and that the churchwardens and vestrymen so elected shall have power to call and induct a rector as often as a vacancy happens therein, and to take into their possession and management all the temporalities belonging to such church or congregation." (3 *R. S.*, 292.)

Keeping in view the wise intention of the legislature, that the act carefully confines the right of voting for church officers to the persons who shall have honestly belonged to the church or congregation for the last twelve months pre-

ceding the election, it does not require the gift of prophecy to foretell that if the members of distinct corporations, or strangers, were to possess the right of voting in common for the officers of this church, it would open a door to mischiefs dangerous to all religious societies, and hurtful to the growth of genuine religion. For example, two or more sects might, by combining against another religious body, and by superior numbers on the day of election, force their own creatures into office, and, thus brought into public life, might appoint a clergyman against the decided opinions and wishes of the congregation.

The same creatures might, also, manage the temporal affairs of the congregation in a way destructive of their interests.

The next inquiry is: Whether the members of the new corporations, or a stranger, such as this plaintiff, have a right to vote at the elections of the corporation of Trinity church?

The foundation for the claim of this right is the single circumstance that the charter incorporates " all persons inhabiting or to inhabit the city of New York, and in communion with the protestant church of England."

These general words of the charter, when the real meaning of the grantor is extracted from them, will be discovered not to afford the slightest pretext for the claim of the plaintiff. The charter, like every other grant, must be interpreted with reference to the actual state of things at the time it bears date. Looking from this ground, we shall see that the state, at the date of the charter, was a province of Great Britain, and consequently subject to its laws. The protestant episcopal church was the established church of the mother country; and the crown, in its generosity to the episcopalians in the city of New York, naturally sought to place Trinity church on a footing as similar to that of the church of England as local circumstances would permit. The population of the city at the same period was so incon-

siderable that the whole number of episcopalians on the island was not sufficient to fill the building already erected for public worship.

On the other hand, the revolution which accomplished the independence of this country, the rapid increase of the population of the city, and the new episcopal corporations which have sprung from the parent church, being out of the reach of human foresight, could not be provided for.

With confidence, then, it may be asserted that the episcopalians inhabiting the city of New York are not all of them parishioners of the parish of Trinity church. Such of them as are members of the new corporations have become parishioners of the parishes attached to them, the legal effect of which is virtually to dissolve their connection with the parish of Trinity church.

It is no less demonstrable that members of the Dutch Reformed church, as this plaintiff is, and who are unaccustomed to take the sacrament in episcopal churches, are not of the communicants intended by the charter.

By the discipline of the English church no person can, at the same time, be a regular communicant in separate parishes under the care of different and independent rectors. The canons of the church particularly direct that " the sacrament shall not be administered by the rector of one parish to the parishioners of another, without the license of the rector of the latter parish, except to travelers, to persons in danger of death, or in cases of necessity." (1 *Burns' Ecclesiastical Law,* 677 *and* 682).

The rector is authorized, under certain circumstances, to refuse the sacrament even to his parishioners; and to be regular, the parishioners should communicate at least thrice in every year.

The only legal evidence that the parishioner is a communicant is his receiving the sacrament in the parish church, by and with the consent of the priest, and the rector cannot

take notice of the receipt of the communion in other parishes.

To admit a communicant under any other circumstances would be deemed an offense against ecclesiastical discipline, both in the priest administering and in the parishioner receiving the sacrament; and it is an undeniable position in law that no right can be derived from the commission of a wrong.

Upon these principles it was constantly maintained, before the revolution, that no persons but those who were received or born in the church, and communed in Trinity, or one of its chapels, were entitled to vote under the charter. The third section of the act entitled "an act for making such alterations in the charter of the corporation of Trinity church as to make it more conformable to the constitution of the state," passed 17th April, 1784, embraces the same principles with respect to communicants, by restraining the privilege of voting to such inhabitants of the city "as shall, in the said church, partake of the holy sacrament of the Lord's Supper at least once in every year."

Some contend that this section, by using the words "the said church," refers to the spiritual body of the church, and not to the building of Trinity church; and hence they argue that communicants in any other episcopal church are qualified to vote.

It will much assist our search after the true import of the words, "the said church," if we take the entire section, with its preamble, into consideration, and proceed at once to ascertain the objects for which it seeks to provide.

Bearing in mind the title of the act just quoted, it is worthy of notice that after declaring the manner of inducting the rector, as prescribed by the charter, to be inconsistent with the letter and spirit of the constitution, the act substitutes a different mode of induction, by vesting the church-wardens and vestrymen of the corporation with "full power

to induct a rector to the said church as often as there shall be a vacancy."

Here the term church leaves no room for inference. By not referring it to Trinity church we torture it into a sense that will defeat the very exercise of the power to induct a rector.

Then comes the following section, with its preamble, which defines the qualifications of the persons who were thereafter to be considered as members of the corporation: "And whereas doubts have arisen on those parts of the said charter and law first above mentioned, which speaks of inhabitants in communion of the said church of England; for removal whereof,

"Be it further enacted, by the authority aforesaid, that all persons professing themselves members of the episcopal church, who shall either hold, occupy, or enjoy a pew or seat in the said church, and shall regularly pay to the support of the said church, and such others as shall in the said church partake of the holy communion of the Lord's Supper at least once in every year, being inhabitants of the city and county of New York, shall be entitled to all the rights, privileges, benefits, and emoluments which, in and by the said charter and law first above mentioned, are designed to be secured to the inhabitants of the city of New York, in communion of the church of England."

It is asked, then, whether the word church, in the section cited, means a building dedicated to divine service; or whether, applying the question more directly to the case in hand, we are to understand by the word the building of Trinity church?

In expounding a statute we are to presume that the legislator used words in their most usual signification—that he had the subject-matter constantly in mind—that all his expressions were directed to a reasonable end—that his train of thought was uniform—and that he intended to infuse into every part of the statute the same spirit.

By the help of these rules the meaning of the word church will be easily ascertained.

In the first clause of the section before us, the legislator declares that those inhabitants of the city shall be members of the corporation of Trinity church " who shall hold, occupy, or enjoy a pew or seat in the said church."

These words cannot possibly be satisfied otherwise than by interpreting the word church, according to its common acceptation, to mean a building dedicated to the service of God.

The legislator speaks in the act at large of many of the inhabitants of the city as members of the corporation of Trinity church, of the induction of a rector, and of the necessity of altering the charter so as to make it conformable to the constitution of the state. Indeed, the whole subject which engages his mind appears to be that corporation and its charter. It would, therefore, be a very unnatural exposition of the section to apply the word church to any building except one belonging to the corporation of Trinity church ; and the more so as Trinity church and its chapels were the only episcopal buildings in the city at the time.

In the second clause of the section the legislator further declares that, " such others" shall also " be members of the corporation as shall, in the said church, partake of the holy sacrament of the Lord's Supper at least once in every year, being inhabitants of the city of New York."

As this clause expressly enjoins it upon the communicants to take the sacrament in the said church, we must, out of decency, admit that a building in which the sacrament might be administered was in the legislator's eye ; or else we must attribute to him a want of due reverence for that most holy ordinance.

It cannot reasonably be doubted that the building here also meant by the legislator was Trinity church.

In fixing the qualifications of corporators the legislator

judged it expedient to give them pews and seats in Trinity church; and this church is the last antecedent to that in which the communicants are to partake of the sacrament. Why, therefore, should we imagine that the legislator in one clause meant to make the holding of a pew or seat in Trinity church an indispensable qualification of membership, and that, in the clause next succeeding, it was his intention to allow the communicants of different churches to be members? Would not this singular change of mind justly expose the legislator to the charge of ficklensss? And to this charge might there not as truly be added the serious imputation of wilfully violating the settled discipline and ancient practice of the church, by obliging the vestry of Trinity church to acknowledge as their commnnicants, men who regularly took the sacrament in churches entirely free from their control.

It follows, as a necessary consequence, that the true meaning of the section under consideration, requires the inhabitants of the city to communicate—I mean honest and pure communication—or to hold pews or seats in Trinity church, in order to qualify them to be members of its corporation. If, in fact, the section stood alone, and doubts arose as to its true meaning, they would instantly be dispelled by construing the section in connection with the title and other parts of the act. The express purposes of the act are to relieve and benefit Trinity church; and wherever the word church occurs, without designation or epithet, it will be found that Trinity church alone is contemplated by the legislator.

Admitting the premises to be true, and the reasoning from them to be just, we shall be authorized to conclude that this plaintiff has no vested rights in the corporation of Trinity church, and of course, that the right of election cannot be " divested or impaired by the limitation provided by the bill," because—1. This plaintiff is not a parishioner of the parish of Trinity church.

2. He is not a communicant in that church.

3. He does not hold a pew or seat in that church, or contribute to its support.

Since the days of Henry VIII., the gift of all the clergy in the English church to their livings, or rather the gift of the livings to the clergy, was vested in the crown. This was nominal, however, for the crown always allowed the ,bishops of the different dioceses to exercise the right of granting livings. (There are exceptions to this rule, where private parties have the gift of livings.) In the charter granted to Trinity church by the crown in 1697, (*charter, l.* 225,) the right as rector in the church in the city of New York was conferred by said charter upon the bishop of London, first; and, after his decease, the power of appointing and installing a rector was to be done as other rectors and parsons were appointed in said English church. The vestry had the right, however, by said charter, to levy and assess from the inhabitants in communion with the church of England to support and maintain said church. In order to make matters in church affairs conform more to the liberal views then beginning to be entertained by the people of the colony, the power, among other improvements, to collate and induct a rector, was, by colonial act of the legislature, passed 1704 and approved by the crown through the then governor, Lord Cornbury (*Van Schaack's Laws, p.* 60), vested in the churchwardens and vestrymen. This was the first improvement in the charter of the church. The next improvement we find was that conferred in the 36th section of the constitution of this state, formed in 1777, which section confirms all the grants formerly given by the crown to the church before 1775. The next improvement we find appended by law to the charter of the church, was that contained in the act of 1784, section 3, where it is declared, among other things, that all persons who pay to the support of the church, or hold or occupy a pew in the same, or who shall partake of the holy sacra-

ment once in each year, shall be entitled to all the benefits and emoluments of the church. This act also appointed a new set of church hands and vestrymen (1 *Jones & Varick's Laws*, 128). This act annulled all parts of the charter of Trinity church which was inconsistent with the new constitution of this state. The last act above referred to was, by many, thought to deprive Trinity church of its name and title formerly given it by the colonial legislature. A law was, accordingly, passed in 1788 by the legislature of this state (2 *Jones & Varick's Laws*, 346), confirming their old name, or nearly so. This act allowed them to take the corporate name of "The rector and inhabitants of the city of New York in communion of the protestant episcopal church in the state of New York;" and finally, on Jan. 25, 1814, an act was passed which declared, among other things, section 2:

"And be it further enacted, that all male persons of full age, who, for the space of one year preceding any election, shall have been members of the congregation of Trinity church aforesaid, or any of the chapels belonging to the same, and forming part of the same religious corporation, and who shall hold, occupy or enjoy a pew or seat in Trinity church, or in any of the said chapels, or have partaken of the holy communion therein within the said year, and no other persons, shall be entitled to vote at the annual election for the churchwardens and vestrymen of the said corporation."

Now all the several acts and amendments which I have referred to, were passed in order to mould the institutions of the church—Trinity church and others—to suit the changed condition of the government, and to accord with the rapid improvement and progress of the age. And I hold as a principle, that although the legislature has ever been inflexible in its resolution to preserve the inviolability of private property, yet it has from time to time exercised its discretion in moulding the elective franchise of corpora-

tions into new shapes, the better to adapt it to the changes occasioned by the freedom of our government and the progress of society; the one being considered as a subject too sacred to be touched, and the other as a subject fit to be carefully handled.

In regard to the allegation contained in the sixteenth paragraph of the complaint, it is alleged "that the trust estate in the possession of said defendants and their associates, styling themselves 'the rector, churchwardens, and vestrymen of Trinity church, in the city of New York,' consists of lands in said city, anciently described as 'the King's Farm and Garden,' and a grant made by Wouter Van Twiller to Anneke Jants and Roeloff Jansen her first husband, for eminent services, said grant consisting of sixty-two acres, Dutch measure, situate next north of said Farm and Garden, and south of Christopher street, and between Hudson River and Broadway, on the west and east in said city; also the parish church site and edifice, as described in said original charters of 1697 and 1704."

This court can only say, from a most careful inspection of all the charters, grants and conveyances to said corporation, and set out as a part of this complaint, or referred to therein, that their title to said lands and property seems most indisputable. A brief glance at the muniments of title cited in this pleading, and which vest said property in the church, must convince at once the greatest skeptic of this fact. The Dutch West India Company was founded in 1621, and in 1623 they procured from the Dutch Government a grant, among other things, of all the lands situate on the Island of Manhattan—now the city and county of New York—and about the same time they formally took possession of their property, and then and there established a settlement or town. It was called New Amsterdam. After planting such settlement (1626) they purchased the entire island from the Indians (a tribe called the Manahattoes) for the sum of $24. In 1664, the English forces under

Groesbeeck agt. Dunscomb.

Col. Nicolls captured the settlement and all things appertaining thereto, together with the entire Dutch country (New Netherlands) in America, from the Dutch, and held it for several years. The English renamed New Amsterdam, and called it the city of New York, after the Duke of York, King Charles II.'s first brother. In 1673, the Dutch recaptured the island from the English, and held it a few months, and finally, in 1674, when Holland and England made peace with each other, the entire island, together with all other possessions of the Dutch on this continent, was ceded to the English crown. When the Dutch recaptured the city of New York, in 1673, they renamed the town and called it the city of Orange, and during the short time which they retained it in their possession, they established what they called "the reformed Christian religion, conformable to the synod of Dordrecht," prohibiting any other kind of faith therein. *(See 1st Vol. Documentary History of the State of New York, by Dr. O'Callaghan, page 608).* Everardus Bogardus was the first minister of the Dutch church, and to him was assigned by the Dutch West India Company, on which to live, certain lands and tenements as house, glebe, &c.

The church in which he preached was within the precincts of a fort which then stood on the extreme point of the island, where the battery now is. After the English took possession, in 1664, governor Andrews established the English church, known as "the church of England in America," and the first service was held in the church within the fort, in which the Dutch service had formerly been held. The English government did not, as the Dutch had formerly done, prohibit any other form of religion but their own; they allowed all the inhabitants to enjoy their own form of faith. The episcopalians continued to worship in the old fort for some years, until governor Fletcher, the captain-general of the province in 1697, procured for them the charter now known as the charter of Trinity church,

and also a grant, with the charter, of land running from Broadway to the Hudson River, being the same lands upon which Trinity church and its graveyard attached now stands. This was the first grant to the church. The next grant I find was that in the reign of Queen Anne. This was a grant, in 1705, to the corporation of Trinity church, by deed patent from Lord Cornbury, the then governor of the province. It consisted of a tract of land called the Queen's or King's Farm, lying on the west side of Manhattan Island, extending from where Saint Paul's church now stands to Skinner's road, now Christopher street, and from Broadway to North River. The property is described in the grant as follows: "All those our several closes, pieces and parcels of land, meadows and pastures, formerly called the Duke's Farm and the King's Farm, now known by the name of the Queen's Farm, with all, &c. &c. &c., * * *" bounded on the east partly by the Broadway, partly by the common, and partly by the swamp, and on the west by Hudson's River; and also all that piece or parcel of ground situate and being on the south side of the churchyard of Trinity church aforesaid, commonly called and known by the name of the Queen's Garden (this was called the Dutch Dominie's Bowerie,) fronting to said Broadway on the east, and extending to low-water mark upon Hudson River on the west. * * * *(See Wm. Bradford's map, made 1728, now in possession of the court).*

Some dispute arose by some of the then inhabitants of New York, about the grant of 1705, saying that it was not valid, and a suit was brought and notice filed; but, for the purpose of ending all litigation and misunderstanding about the same, the entire grant, in 1714, was again confirmed by the Queen through Lord Bolingbroke. *(See Book of Patents, No. 7, p. 338, Secretary of State's Office).*

Now these grants cover all the lands about which there is so much said, and to which certain pretended claims are

laid, none of which, as far as I have seen, have the slightest resemblance of legal fairness.

When the crown made these several grants to the church, it was in the full possession and enjoyment of all the property so granted, and through its governors and officers of law it gave the like possession of all of said property to the corporation of Trinity church, which property has been thus lawfully in their possession until this hour, except such as the church corporation has seen fit to dispose of. These grants have all been confirmed, since the revolution, by the legislature of the state of New York, to the corporation of Trinity church.

A debt is, by the wise policy of the law, outlawed and irrecoverable unless it has been acknowledged by the debtors within six years before suit is commenced. Twenty years' possession, with claim of rightful ownership of land (which the law has always considered the most sacred of all property) is a bar to all recovery by another, let his claim be otherwise ever so just and equitable. Now the fact of this corporation being in the lawful and just possession of this property for over one hundred and fifty years, taken together with the law I have just laid down, should satisfy the most unreasonable mind that the pretended claim set up in the sixteenth paragraph of this complaint is of the most absurd kind.

About this synod of Dort, absurdly called in this complaint, " the ecumenical council of Dort," I regret that I am constrained in any way to refer to the subject; but as the matter has been referred to in the plaintiff's pleadings, and has been made the basis of a count in said complaint, I think some explanation is required as to what this meeting at Dort, anciently called Dordrecht, was. It is a universally admitted historical truth that the church of England holds the catholic faith to be necessary. It does not in any one of its articles of faith use the word protestant, or call itself in the title the protestant church. On the contrary, it calls

itself the church of England as by law established, and it acknowledges but one baptism for the remission of sins ; and in its 20th article it recognizes the authority of the church (English church) in matters of faith. Luther, we all know, is esteemed by protestant dissenters almost as a saint, but he is not recognized in the calendar of the saints of the English church, as are St. Peter, St. Clement, St. Boniface, St. Gregory, and many others. Then the English church observes in some degree as their principal feast-days, Christmas, Easter, Ascension, and Whitsuntide. Now these holydays are all denounced by the assembly at Dort, who were, as the complaint alleges, the founders of the faith or doctrines which this plaintiff, in the twelfth paragraph of his complaint, claims to profess as a faith.

The assembly of men at Dort, ridiculously called in this complaint an " ecumenical council of Dort"—it is notorious to the merest child in history that it was not a council at all. It was a mere gathering of men, a synod of the Dutch Reformed church and some delegates from Scotland, brought together to settle some trifling and miserable disputes between Calvanists, Armenians, Gomarists, and the like. Its decrees or settlements were never recognized by the English church. Indeed, the English people knew nothing whatever of the synod until it was over ; and when its proceedings were brought to their knowledge by one or two of James I.'s bishops, who happened to be near the city where the synod was held, the doctrines laid down by that council were quite repudiated both by king and bishops.

Ecumenic, universal—ecumenical council means a universal council, a council of all, not of a part, and is only applied to the councils of the catholic church ; whereas the synod of Dort, which the plaintiff improperly calls the " ecumenical council of Dort," was simply a meeting of a few of the presbyteries of the presbyterian and Reformed Dutch churches. The word synod signifies simply a meeting of the few adjoining presbyteries. *(See Walker's*

*Dictionary, also Appleton's American Cyclopædia, vol.* 13, *p.* 553).

In regard to the question of granting leave to amend. This I cannot do, because I am satisfied that the plaintiff's notions as to his rights and remedies are wild, visionary, and absurd; and I think I will be doing an act of great kindness to him in dismissing the complaint altogether. As to the question of costs and allowances, I think my proper course will be to put defendants to their remedy by motion for that purpose. I will say here, however, that I think as the amount claimed to be involved is very large, the allowance should be in proportion, so that those who go to law with this corporation, or any other person or corporation, will see at once that they have at least a probable cause of action, and if they have not, and still persist in notoriety of this kind, they will be compelled at least to pay for such litigation.